1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
BRODSKY & SMITH, LLC
9595 Wilshire Blvd., Ste. 900
Beverly Hills, CA 90212
Telephone: (877) 534-2590
Facsimile: (310) 247-0160

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

ALESHA DAVIS,

                Plaintiff,

     vs.

CALIFORNIA METAL-X (CMX),

            Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

(Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.)

**JURY TRIAL DEMAND**

     Plaintiff Alesha Davis ("Plaintiff"), by and through her counsel, alleges as follows:

     1.     This is a citizen suit, brought pursuant to the section 505(a)(1) of the Federal Water Pollution Control Act (the "Clean Water Act" or "CWA"), 33 U.S.C. § 1365(a)(1), to address violations of the CWA by defendant California Metal-X (CMX) ("California Metal X" or the "Defendant") arising out of operations at Blair Adhesives' facility located at 366 East 58th St., Los Angeles, CA 90011 (the "Facility").

2.     Since at least December 6, 2014, Defendant has been discharging and continues to discharge polluted stormwater from the Facility in violation of the express terms and conditions of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342, and in violation of the General Industrial Stormwater Permits issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ) ("1997 Permit") and Order No. 2014-0057-DWQ ("2015 Permit") (collectively, the "Industrial Stormwater Permit" or "IGP").

3.     Plaintiff seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorneys' and expert witness fees, for Defendant's repeated and ongoing violations of the Clean Water Act.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over the parties and subject matter of this action pursuant to section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), 28 U.S.C. § 1331 (an action arising under the laws of the United States), and 28 U.S.C. § 2201 (declaratory relief).

5.     On December 6, 2019, as required by the CWA, 33 U.S.C. § 1365(b)(1)(A), Plaintiff provided notice of intent to file suit against Defendant for CWA violations ("NoV") to the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the Regional Water Quality Control Board, Los Angeles Region ("Regional Board") collectively, "state and federal agencies") and Defendant.

6.     The NoV provided Defendant with sufficient information to determine (i) the CWA requirements Plaintiff alleges Defendant violated, (ii) the activity alleged to constitute the violation(s), (iii) sufficient information to determine the

date, location, and person responsible for the violation(s), and (iv) the contact information for the Plaintiff and Plaintiff's Counsel.  A copy of the NoV is attached as Exhibit 1.

7.    More than sixty (60) days have passed since the NoV was served upon Defendant and the state and federal agencies.  During this time, neither the EPA, nor the State of California, has commenced or is diligently prosecuting a court action to redress the violations alleged herein.  No claim in this action is barred by any prior administrative action pursuant to section 309(g) of the CWA, 33 U.S.C. § 1319(g).

8.    Venue is proper in the Central District of California pursuant to section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

**PARTIES**

9.    Plaintiff is a citizen of the State of California who, through her recreational activities, uses and enjoys the waters of the Los Angeles River, its inflows, outflows, and other waters of the overall Los Angeles River Watershed, of which the Los Angeles River is a part.  Plaintiff's use and enjoyment of these waters is negatively affected by the pollution caused by Defendant's operations.  Plaintiff is dedicated to protecting the water quality of the Los Angeles River, and the overall Los Angeles River Watershed, for the benefit of its ecosystems and communities.  To further these goals, Plaintiff actively seeks federal and state agency implementation of the CWA, and, where necessary, directly initiates enforcement actions on behalf of herself and for her community.

10.   Plaintiff, like other citizens, taxpayers, property owners, and residents of her community, lives, works, travels near, and recreates in, the Los Angeles River, its inflows, outflows, and other waters of the overall Los Angeles River Watershed, of which the Los Angeles River is a part, into which Defendant discharges pollutants.  Plaintiff, like other citizens, taxpayers, property owners, and residents,

uses and enjoys the Los Angeles River, its inflows, outflows, and other waters of the overall Los Angeles River Watershed, of which the Los Angeles River is a part, for recreational, educational, scientific, conservation, aesthetic, spiritual, and other purposes. Defendant's discharges of stormwater containing pollutants impairs each of these uses. Thus, Plaintiff's interests have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the CWA and the Industrial Stormwater Permit.

11.    Plaintiff enjoys going to the Dominguez Gap Wetlands Park (the Park"). Plaintiff enjoys relaxing in the park and walking along the paths located in the Park.

12.    The Los Angeles River runs immediately adjacent to the Park, and the Los Angeles River is accessible from the Park by Park goers to recreate and fish in. While at the Park, Plaintiff has witnessed the polluted nature of the Los Angeles River. She has observed that the Los Angeles River appears both brown and dirty. In addition to her visual observation of the water, Plaintiff has also noticed an unpleasant smell coming from the water.

13.    Plaintiff is aware that Defendant's Facility is upstream from the Park and that the pollution from the Facility flows downstream through the Los Angeles River and the Park before ultimately reaching the Pacific Ocean. Plaintiff believes that this has degraded the beauty of the Park and curtailed her enjoyment of the Park.

14.    Plaintiff intends to return to the Park in the future and believes that reducing Defendant's pollution of the Los Angeles River will improve the water quality in the Los Angeles River and allow her the opportunity to better enjoy the recreational and aesthetic interests in the Los Angeles River and the Park.

15.    Defendant is a California Corporation with headquarters at 366 East 58th St., Los Angeles, CA 90011.

PLAINTIFF'S COMPLAINT

16.     Defendant owns and operates the Facility, located at 366 East 58th St., Los Angeles, CA 90011.

17.     The Facility operates as a manufacturer of brass and bronze engineered alloys and ingots for foundry mill customers.  Industrial activities carried out at the Facility include (i) aluminum shredding; (ii) metal shredding; (iii) wire chopping; (iv) radiator processing; (v) magnetic separation of metals; (vi) sierra shell casing separator operation; (vii) sierra shear operation; (viii) materials storage; and (ix) equipment storage.  Repair and maintenance activities carried out at the Facility include, but are not limited to, electrical, plumbing, roofing, asphalt, concrete, and utilities repairs as well as janitorial duties.

18.     The Facility's industrial activities fall under Standard Industrial Classification ("SIC") Code 3341, relating to Secondary Smelting and Refining of Nonferrous Metals and SIC Code 5093, relating to Scrap and Waste Recycling. Defendant applied for and received coverage under the California Industrial General Permit since at least March 23, 1992, and was issued WDID No. 4 19I000881. Defendant reapplied for coverage under the 2015 Industrial Stormwater Permit on July 1, 2015, and was granted the continued use of its previously issued WDID No. These "Notice of Intents" for the Facility to comply with the terms of the Industrial Stormwater Permit list "California Metal X" and "CA Metal X" as the Operator and Facility name, respectively.  Plaintiff is therefore informed and believes and thereon alleges that Defendant owns and/or operates the Facility.

## REGULATORY BACKGROUND

### *The Problem of Stormwater Pollution*

19.     Stormwater runoff is one of the most significant sources of water pollution in the nation and has been recognized as a leading cause of significant and cumulative harmful impacts to the water quality of the Los Angeles River, its inflows, outflows, and other waters of the overall Los Angeles River Watershed, of

PLAINTIFF'S COMPLAINT

which the Los Angeles River is a part.  With every rainfall event, significant amounts of polluted rainwater flow from local industrial facilities, such as the Facility, and pour into storm drains, local tributaries, and directly into the Los Angeles River, its inflows, outflows, and other waters of the overall Los Angeles River Watershed, of which the Los Angeles River is a part.

20.     Stormwater runoff from industrial sites such as the Facility causes harm to humans and aquatic life.  In particular, stormwater can contain heavy metal pollutants such as aluminum, chromium, copper, iron, lead, mercury, nickel, tin, and zinc, as well as high concentrations of suspended solids, and nitrate plus nitrite nitrogen.  Exposure and ingestion of heavy metals can cause health problems in people and aquatic animals, including neurological, physiological, and reproductive effects.  Heavy metals have been shown to alter activity in tissues and blood of fish.

21.     High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis.  TSS has been shown to alter predator/prey relationships (for example, turbid water might make it difficult for fish to see their prey).  Deposited solids alter habitat for fish, aquatic plants, and benthic organisms.  TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are absorbed onto TSS.   Thus, higher concentrations of TSS mean higher concentrations of toxins associated with those sediments.  Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

***The Clean Water Act***

22.     CWA section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge is in compliance with various enumerated CWA requirements.  Among other things, CWA section

301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to CWA section 402, 33 U.S.C. § 1342.

23.    CWA section 402(b), 33 U.S.C. § 1342(b), allows each state to administer its own EPA approved permit program for discharges.  In California, the State Board and its nine Regional Boards have approval from EPA to administer an NPDES permit program for the State.  The State Board and Regional Boards issue individual and general NPDES permits regulating water pollutant discharges from various categories of dischargers.

24.    CWA section 402(p), 33 U.S.C. § 1342(p), requires that NPDES permits be issued for stormwater discharges "associated with industrial activity."

25.    CWA section 301(b) required that, by March 31, 1989, all point source dischargers, including those discharging polluted stormwater must achieve technology based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

26.    CWA section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. § 1365(a)(1), see 33 U.S.C. § 1362(5).

27.    CWA section 505(a) authorizes a citizen suit action for injunctive relief. 33U.S.C. § 1365(a).

28.    CWA violators are subject to an assessment of civil penalties of up to $51,570 per day per violation for violations occurring after November 2, 2015 and $37,500 per day per violation for violations occurring after January 12, 2009 but before November 2, 2015.  33 U.S.C. § 1319(d), 40 C.F.R. §§ 19.1-19.4.

1 *State Regulations*

2     29.    Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt

3 Water Quality Standards, including water quality objectives and beneficial uses for

4 navigable waters of the United States.  The CWA prohibits discharges from causing

5 or contributing to a violation of such state Water Quality Standards.  *See* 33 U.S.C.

6 § 1311(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).

7     30.    The State of California regulates water quality through the State Board

8 and nine Regional Boards, and each Regional Board maintains a separate Water

9 Quality Control Plan which contains Water Quality Standards for water bodies

10 within its geographic area.

11     31.    Water Quality Standards ("WQS") applicable to Defendant are set forth

12 in the California Toxic Rule ("CTR")[1] and the Inland Surface and Coastal Waters of

13 Los Angeles and Ventura Counties Water Quality Control Plan (the "Basin Plan").

14 Exceedances of WQS constitute violations of the Industrial Stormwater Permit, the

15 CTR, and the Basin Plan.

16     32.    The Basin Plan establishes WQS for all various areas of the inland

17 surface and coastal waters of Los Angeles and Ventura Counties, including the

18 waters of the Los Angeles River, its inflows, outflows, and other waters of the overall

19 Los Angeles River Watershed, of which the Los Angeles River is a part and its

20 tributaries, including but not limited to the following:

21            a.    Waters shall not contain suspended or settleable material in

22            concentrations that cause nuisance or adversely affect beneficial users;

23            b.    Waters shall be free of changes in turbidity that cause nuisance

24            or adversely affect beneficial uses.  Increases in natural turbidity

25            attributable to controllable water quality factors shall not exceed 20%

26

27 [1] The CTR is set forth at 40 C.F.R. § 131.38 and is explained in the Federal Register preamble accompanying the CTR promulgation set forth at 65 Fed. Reg. 31, 682 (May 18, 2000).

28

where natural turbidity is between 0 and 50 nephelometric turbidity units ("NTU"), and shall not exceed 10% where the natural turbidity is greater than 50 NTU;

c.    All waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life; and

d.    Surface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use.

33.    In addition, the EPA has promulgated WQS for toxic priority pollutants in all California water bodies (the "California Toxics Rule" or "CTR"), which include and apply to the Los Angeles River, its tributaries, and the overall Los Angeles River Watershed, unless expressly superseded by the Basin Plan.  65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.

***The Industrial Stormwater Permit***

34.    In California, the State Board has elected to issue a single, statewide general permit applicable to all stormwater discharges associated with industrial activity.  On April 17, 1997, the State Board adopted the 1997 Permit, which was in effect through June 30, 2015.  On July 1, 2015, the 2015 Permit became effective and superseded the 1997 Permit, except for enforcement purposes.[2]  To discharge stormwater lawfully in California, industrial dischargers must secure coverage under the Industrial Stormwater Permit and comply with its terms or obtain and comply

---

[2] Notably, the 2015 Permit is much more comprehensive than its predecessor, including expanding its purview to "Light Industry" uses previously exempted, and including more prescriptive requirements for various parts of permit compliance, including BMPs, NALs, SWPPP requirements, Total Daily Maximum Loads for receiving waters, amongst others.  *See generally,* 2015 Permit.

PLAINTIFF'S COMPLAINT

with an individual NPDES permit.   1997 Permit, p. II; 2015 Permit, Section I(A)(Findings 8, 12).

35.   The Industrial Stormwater Permit is an NPDES permit issued pursuant to CWA section 402(p), 33 U.S.C. § 1342(p).   Violations of the Industrial Stormwater Permit are also violations of the CWA.  1997 Permit, Section C(1); 2015 Permit, Section XXI(A).

36.   The   Industrial   Stormwater   Permit   contains   certain   absolute prohibitions.   The Industrial Stormwater Permit prohibits the direct or indirect discharge of materials other than stormwater ("non-stormwater discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. 1997 Permit, Order Part A(1); 2015 Permit, Section III(B).   The Industrial Stormwater Permit prohibits stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance (1997 Permit, Order Part A(2); 2015 Permit, Sections III(C), VI(C)) and discharges that adversely impact human health or the environment (1997 Permit, Order Part C(1); 2015 Permit, Section VI(B)).   Finally, the Industrial Stormwater Permit prohibits discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.   1997 Permit, Order Part C(2); 2015 Permit, Section VI(A).

37.   On April 1, 2014, the State Board adopted an updated NPDES General Permit for Discharges Associated with Industrial Activity, Water Quality Order No. 2014-57-DWQ, effective as of July 1, 2015.   As of the effective date, Water Quality Order No. 2014-57-DWQ supersedes and rescinds the current Industrial Stormwater Permit, Water Quality Order No. 97-03-DWQ, except for purposes of enforcement actions brought pursuant to the Industrial Stormwater Permit, Water Quality Order No. 97-03-DWQ.

38.    Notably, under the 2015 Permit, all "Light Industry" facilities falling under SIC where industrial materials, equipment, or activates are not exposed to stormwater are now required to obtain coverage under the IGP. [3]

39.    Under the CWA and the Industrial Stormwater Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate stormwater pollution.   33 U.S.C. § 1311(b); 1997 Permit, Order Part B(3); 2015 Permit, Section X(H).   The EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards.   Final National Pollutant Discharge Elimination System (NPDES) General Permit for Stormwater Discharges From Industrial Activities ("Multi-Sector Permit"), 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000); Multi Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi Sector Permit, 80 Fed. Reg. 34,403 (June 16, 2015).

40.    The 2015 Permit includes Numeric Action Limits (NALs) that are based on Benchmarks.  2015 Permit, Section I(M) (Finding 62).  Like Benchmarks, the NALs indicate "the overall pollutant control performance at any given facility." *Id.*  Section I(M) (Finding 61).

41.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin.  1997 Permit, Section A(1)(a) and Order Part E(2); 2015 Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility.  1997 Permit, Section A(2); 2015 Permit, Section X(G).  The SWPPP must identify and implement site-specific BMPs to

---

[3] Light Industry" facilities are included in the category of "Manufacturing Facilities" defined in the Industrial Stormwater Permit as "Facilities with Standard Industrial Classifications (SICs) 20XX through 39XX, 5221 through 4225."[3]  *See*, Industrial Stormwater Permit, Attachment A, Category 2.

reduce or prevent pollutants associated with industrial activities in stormwater and authorized non-stormwater discharges.  1997 Permit, Section A(2); 2015 Permit, Section X(H).  The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT.  1997 Permit, Order Part B(3); 2015 Permit, Sections I(D) (Finding 32), V(A).

42.    The SWPPP must include:  a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the stormwater conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution generating activities, nearby water bodies, and pollutant control measures; a description of stormwater management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP.  1997 Permit, Section A(1)-(10); 2015 Permit, Section X.

43.    The Industrial Stormwater Permit also requires facility operators to properly operate and maintain any facilities and systems of treatment and control installed or used to achieve compliance with the conditions of the Industrial Stormwater Permit and requirements of the SWPPP at all times.  1997 Permit, Section C(5); 2015 Permit, Section XXI(F).

44.    The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness.  1997 Permit, Sections A(1), B(3)-(4); 2015 Permit, Sections I(J) (Finding 55), X(B)(1).

45.     The 1997 Permit required facility operators to develop and implement a monitoring and reporting program ("MRP") when industrial activities begin at a facility.  1997 Permit, Section B(1)-(2) and Order Part E(3).  The MRP must ensure that stormwater discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the 1997 Permit. *Id*. at Section B(2).  The MRP must ensure that practices at the facility to prevent or reduce pollutants in stormwater and authorized non-stormwater discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP.  *Id*.

46.     Facilities are required to make monthly visual observations of storm water discharges.  The visual observations must represent the quality and quantity of the facility's storm water discharges form the storm event.  1997 Permit, § B(7); 2015 Permit, § XI.A.

47.     The 2015 Permit requires facility operators to monitor and sample stormwater discharges to ensure that the facility is complying with the terms of the permit.  2015 Permit, Sections I(J) (Findings 55-56); XI.

48.     Under the 1997 Permit, facilities must analyze storm water samples for "toxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."  1997 Permit, § B(5)(c)(ii).  Under the 2015 Permit, facilities must analyze storm water samples for "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment." 2015 Permit, § XI(B)(6)(c).

49.     Pursuant to the monitoring and reporting requirements of the Industrial Stormwater Permit, facility operators must conduct ongoing visual observations of stormwater and non-stormwater discharges and record responsive measures taken to eliminate unauthorized non-stormwater discharges and to reduce or prevent

pollutants in stormwater and authorized non-stormwater discharges. 1997 Permit, Sections B(3)-(4); 2015 Permit, Section XI(A). Facility operators must collect samples of stormwater discharges from all locations where stormwater may be discharged from the facility. 1997 Permit, Sections B(5), (7); 2015 Permit, Section XI(B)(4)-(5). As a part of MRP, these collections and analyses must be conducted twice a year; samples must be collected during "the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season." *Id.* Through the 2014-2015 reporting period, facility operators were required to analyze stormwater samples for pH, total suspended solids, total organic carbon (or oil and grease as a substitute), specific conductance, toxic chemicals, and other pollutants which are likely to be present in significant quantities in stormwater discharging from the facility. 1997 Permit, Section B(5).

50. Section XI(B)(2) of the 2015 Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30).

51. The EPA has established the Benchmark values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. *See*, U.S. EPA Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (the "MSGP"). These Benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish. Notably, the Benchmark levels contained in the MSGP is "consistent" with the BMPs required of facilities under the Industrial Stormwater Permit, and serve as the reference point for the Numeric Action Levels ("NALs") contained in the IGP itself. 2015 Permit I(D)(33).

52.     These Benchmarks are reflected in the 2015 Permit in the form of Numeric Action Levels ("NALs").  The 2015 Permit incorporates annual NALs, which are derived from a Water Board dataset.  The following NALs have been established under the 2015 Permit for facilities under SIC codes 3341 and 5093: (i) Oil & Grease – 15.0 Mg/L; (ii) Total Suspended Solids ("TSS") – 100 Mg/L; (iii) Aluminum – 0.75 Mg/L; (iv) Lead – 0.262 Mg/L ; (v) Iron – 1.0 Mg/L; (vi) Zinc – 0.26 Mg/L; (vii) Copper – 0.0332 Mg/L; and (viii) Chemical Oxygen Demand – 120 Mg/L.  An exceedance of annual NALs occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL.  The reporting year runs from July 1 to June 30.  The 2015 Permit also established the following instantaneous maximum NALs for all permitted facilities: (i) pH – 6.0 – 9.0 s.u.; (ii) TSS – 400 Mg/L; and (iii) Oil & Grease – 25 Mg/L.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires revision of the SWPPP and additional BMPs.  If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.

53.     Section B(14) of the 1997 Permit requires dischargers to include laboratory reports with their Annual Reports submitted to the Regional Board.  This

requirement is continued with the 2015 Permit.  2015 Permit, Fact Sheet, Paragraph O.

54.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $51,570 per day per violation for violations occurring after November 2, 2015 and $37,500 per day per violation for violations occurring after January 12, 2009 but before November 2, 2015.  33 U.S.C. § 1319(d), 40 C.F.R. §§ 19.1-19.4.  *See also* 40 C.F.R. §§ 19.1 -19.4.

## STATEMENT OF FACTS

*Facility Background*

55.     Defendant operates the Facility located at 366 East 58th St., Los Angeles, CA 90011.

56.     The Facility is regulated by the Industrial Stormwater Permit.

57.     Defendant submitted or was covered by a Notice of Intent to comply with the Industrial Stormwater Permit to the State Board at least 1992 and in 2015.

58.     Operations at the Facility generally include the manufacturing of brass and bronze engineered alloys and ingots for foundry mill customers.  Industrial activities carried out at the Facility include (i) aluminum shredding; (ii) metal shredding; (iii) wire chopping; (iv) radiator processing; (v) magnetic separation of metals; (vi) sierra shell casing separator operation; (vii) sierra shear operation; (viii) materials storage; and (ix) equipment storage.  Repair and maintenance activities carried out at the Facility include, but are not limited to, electrical, plumbing, roofing, asphalt, concrete, and utilities repairs as well as janitorial duties.

59.    Certain operations at the Facility occur outdoors and are causing pollutants to be exposed to rainfall.

60.    Specifically, plaintiff is aware of industrial processes at the Facility exposed to stormwater, including, but not limited to:

    a.    The storage of large amounts of industrial machinery and products outdoors and not under cover (many of which display visible signs of weathering damage, such as rust);

    b.    The carrying out of industrial processes outdoors and not under cover, including the use of the industrial machinery and products mentioned above; and

    c.    The storage of industrial waste and refuse outdoors not under cover and exposed to stormwater, including the use of dumpsters, trash cans, chemical containers, and accumulation of waste such as rusted metal parts.

61.    Vehicles and equipment at the Facility expose many other sources of pollution to the elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids.

62.    The types of pollutants released by the Facility into the immediate environment are known to include, or have the potential to include, among other contaminants; total suspended solids ("TSS"), waste oils, lubricants, fuel, trash, debris, hazardous materials, oil and grease, pH, heavy metals, and other pollutants.

63.    The industrial materials stored and the pollutants generated at the Facility are exposed to stormwater flows.

64.    Activities at the Facility generate significant debris and particulate matter, which contain pollutants and settle on surfaces within the Facility.  During rain events, this pollution washes off of those surfaces and flows into the Los Angeles River, its inflows, outflows, and other waters of the overall Los Angeles

River Watershed, of which the Los Angeles River is a part. Stormwater from the Facility discharges into the Los Angeles River, its inflows, outflows, and other waters of the overall Los Angeles River Watershed, of which the Los Angeles River is a part.

***Activities Contributing to CWA Violations***

65. Defendant has not developed and/or implemented an adequate SWPPP at the Facility, as evidenced by the various violations stated above, at ¶¶ 59-64 *supra*.

66. Defendant has not developed and/or implemented BMPs that adequately minimize the exposure of pollutants to stormwater at the Facility, as evidenced by the various violations stated above, at ¶¶ 59-64 *supra*.

67. Defendant has not developed and/or implemented BMPs at the Facility that adequately control and minimize polluted runoff from the Facility, as evidenced by the various violations stated above, at ¶¶ 59-64 *supra*.

68. Defendant has not developed and/or implemented BMPs at the Facility that adequately treat and remove pollutants in stormwater prior to discharge, as evidenced by the various violations stated above, at ¶¶ 59-64 *supra*.

69. Defendant has not developed and/or implemented adequate BMPs necessary to reduce or eliminate stormwater pollution that constitute BAT/BCTs, as evidenced by the various violations stated above, at ¶¶ 59-64 *supra*.

70. Defendant has not developed and/or implemented adequate BMPs at the Facility to achieve stormwater discharges that meet EPA Benchmarks or applicable Water Quality Standards, as evidenced by the various violations stated above, at ¶¶ 59-64 *supra*.

71. Defendant has not adequately evaluated and revised the Facility's SWPPP to address these failures, as evidenced by the various violations stated above, at ¶¶ 59-64 *supra*. Defendant has also failed to properly operate and maintain the structures and systems that have been put in place at the Facility to achieve

compliance with the Industrial Stormwater Permit and its SWPPP requirements, as evidenced by the various violations stated above, at ¶¶ 59-64 *supra*.

72.     Defendant has not developed and/or implemented an adequate MRP at the Facility which has resulted in practices that do not adequately reduce or prevent pollutants from discharging from the stormwater flows from the Facility, as evidenced by the various violations stated above, at ¶¶ 59-64 *supra*.

73.     Defendant's monitoring activities, or lack thereof, have not effectively identified compliance problems at the Facility or resulted in effective revisions of the SWPPP, as evidenced by the various violations stated above, at ¶¶ 59-64 *supra*.

74.     Defendant has failed to address these issues in the ERA process as proscribed by the IGP, as evidenced by the various continuous and ongoing violations stated above, at ¶¶ 59-64 *supra*.

75.     Due to Defendant's lack of effective pollution prevention measures, including effective BMPs, and its failure to implement an effective monitoring and reporting program, stormwater from the Facility becomes polluted with many constituents.   The potential pollutants from the Facility include among other contaminants; total suspended solids ("TSS"), waste oils, lubricants, fuel, trash, debris, hazardous materials, oil and grease, pH, heavy metals, and other pollutants. Stormwater from the Facility discharges, via the local storm sewer system and/or surface runoff, directly into the Los Angeles River, its inflows, outflows, and other waters of the overall Los Angeles River Watershed, of which the Los Angeles River is a part.

76.     Polluted stormwater is discharged from the Facility into the Los Angeles River, its inflows, outflows, and other waters of the overall Los Angeles River Watershed, of which the Los Angeles River is a part.  The Los Angeles River, Los Angeles River, its tributaries, and the overall Los Angeles River Watershed are waters of the United States.

77.     Defendant's stormwater testing for the required pollutant parameters during the five years before Plaintiff served the NoV upon was wholly insufficient – in fact, the Defendant has failed to submit the required failed to submit the required stormwater testing for a third or fourth Qualifying Storm Event ("QSE") in every annual reporting period prior to the NoV for the previous five reporting periods.   As stated in the Industrial Stormwater Permit, facilities are required to provide testing data, for all requisite NALs, for four QSE's per year.[4]

78.     Due to this complete lack of testing over a five year period, it is likely that there the pollutant parameters of pH, O&G, and/or TSS, are present in the Facility's stormwater runoff far exceeding acceptable levels.

79.     Moreover, Defendant's submitted testing for the 2015-2016, 2016-2017, 2017-2018, and 2018-2019 annual reporting periods indicate the presence of Copper, Zinc, Aluminum, and/or Iron in the Facility's stormwater runoff far exceeding acceptable levels.

80.     Additionally, as stated in the NoV, Defendant has failed to properly address these overages in the ERA process proscribed by the IGP – notably failing to upload proper and/or timely Level 1 ERA Report(s), Level 2 ERA Action Plan(s), or Level 2 ERA Technical Reports as required by the IGP after annual NAL average overages of applicable pollutant parameters were recorded.

81.     The pollutants associated with SIC codes 3341 and 5093 are particularly dangerous to riverine ecosystems, including Oil & Grease, TSS, pH, Chemical Oxygen Demand, and heavy metals such as Aluminum, Lead, Iron, Zinc, and Copper.  Failures to adequately test stormwater runoff, as is the case here, make it difficult to determine both the amount of pollutants being discharged in a facility's stormwater, and the efficacy of any control measures put in place.

---

[4] Under the Previous Industrial Stormwater Permit, this requirement was two QSEs per year.

82.     In addition, in the time since the NoV has been delivered to Defendant, the Facility's has continued to completely ignore its obligations under the IGP, upload testing data for only two (2) QSEs for the 2019-2020 annual reporting period rather than the requisite four (4).

83.     Such failure to comply with the self-monitoring and testing standards of the IGP undercuts the design of the IGP and the ERA scheme which rely on self-monitoring and reported testing to require self-remediation at Facility's monitored by the Regional Board.  By failing to comply with such testing standards, Defendant has failed and is continuing to fail to create and implement adequate BMPs representing BATs and BCTs in place at the Facility, thereby violating the IGP and CWA.

84.     Moreover, the submitted testing reports for this period indicate continued presence of Aluminum, Zinc, and Copper in higher than acceptable levels, with the levels of Aluminum and Zinc actually increasing in concentration in the Facility's stormwater runoff over the reported levels in the previous annual reporting period, indicating that Defendant is continuing to fail to create and implement adequate BMPs representing BATs and BCTs in place at the Facility, thereby violating the IGP and CWA.

85.     Due to these numerous insufficiencies, discrepancies, and overages contained in the Defendant's annual stormwater sampling, the Facility's discharges of stormwater have been, are, and are likely to continue to be regularly contaminated with higher levels of pollutants than are consistent with BMPs that constitute BAT/BCT, and are thus violative the IGP and CWA.

1

2

## FIRST CAUSE OF ACTION

### Discharges in Violation of Permit Prohibitions of the Industrial Stormwater Permit
### (Violations of 33 U.S.C. §§ 1311, 1342)

86.     Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

87.     The Industrial Stormwater Permit requires that "All Discharges of storm water to waters of the United States are prohibited except as specifically authorized by this General Permit or another NPDES permit."

88.     Since at least December 6, 2014, Defendant has been discharging polluted stormwater from the Facility in violation of the Prohibitions of the Industrial Stormwater Permit during every significant rain event (defined by EPA as a rainfall event generating 0.1 inches or more of rain).  *See* Exhibit 1, NoV at Attachment 3

89.     The polluted stormwater discharged from the Facility during every significant rain event contains pollutants harmful to fish, plants, birds, and human health that have adversely affected, and continue to adversely affect, human health and the environment in violation of the Industrial Stormwater Permit.

90.     Discharges of polluted stormwater from the Facility have in the past caused, and will continue to cause, pollution, contamination, and/or nuisance to the waters of the United States in violation of the Industrial Stormwater Permit and the Water Quality Standards set forth in the Basin Plan.

91.     Each day since at least December 6, 2014, that Defendant has discharged polluted stormwater from the Facility in violation of the Industrial Stormwater Permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a).

92.     By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

93.     An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff, for which harm she has no plain, speedy, or adequate remedy at law.

94.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SECOND CAUSE OF ACTION

### Discharge in Violation of Effluent Limitations of the Industrial Stormwater Permit
### (Violations of 33 U.S.C. §§ 1311, 1342)

95.     Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

96.     The Industrial Stormwater Permit's SWPPP requirements and effluent limitations require dischargers to reduce or prevent pollutants in their stormwater discharges through the implementation of measures that must achieve BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

97.     Defendant has discharged and continues to discharge stormwater from the Facility containing levels of pollutants that do not achieve compliance with the BAT/BCT requirements during every significant rain event occurring from December 6, 2014 through the present.  Defendant's failure to develop and/or implement BMPs adequate to achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Industrial Stormwater Permit and the CWA.  *See* 1997 Permit, Order Part B(3); 2015 Permit, Sections I(D) (Finding 32), V(A); 33 U.S.C. § 1311(b).

98.     Each day since at least December 6, 2014, that Defendant has discharged stormwater containing pollutants in violation of the Industrial

Stormwater Permit, specifically Effluent Limitation B(3) of the 1997 Permit, is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

99.    Defendant's CWA violations described in the paragraphs above will continue in the future until Defendant develops and implements BMPs at the Facility adequate to achieve pollutant discharge reductions attainable via BAT and BCT.

100.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365.

101.    An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff for which harm she has no plain, speedy, or adequate remedy at law.

102.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## THIRD CAUSE OF ACTION

**Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan, In Violation of the Industrial Stormwater Permit (Violations of 33 U.S.C. § 1311, 1342)**

103.    Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

104.    The Industrial Stormwater Permit requires dischargers of stormwater associated with industrial activity to develop and implement an adequate SWPPP when they commence industrial activity.  1997 Permit, Section A(1); 2015 Permit, Section X(B).

105.    Defendant, as of December 6, 2014, has commenced industrial activity and continues to conduct industrial activity at the Facility.

106.   Defendant has failed and continues to fail to develop and implement an adequate SWPPP or implement all necessary revisions to the SWPPP for the Facility as required by the Industrial Stormwater Permit.

107.   Defendant has failed and continues to fail to develop or implement a SWPPP for the Facility that includes BMPs adequate to meet the requirements of the Industrial Stormwater Permit, specifically Section A of the 1997 Permit and Section X of the 2015 Permit.

108.   Defendant has failed and continues to fail to adequately develop or implement a SWPPP at the Facility that prevents discharges from violating the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations of the Industrial Stormwater Permit.

109.   Each day since December 6, 2014, that Defendant has failed to adequately develop and/or implement a SWPPP for the Facility in violation of the Industrial Stormwater Permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a).

110.   Defendant has been in violation of the Industrial Stormwater Permit's SWPPP requirements every day since December 6, 2014.  Defendant will continue to be in violation of the SWPPP requirements each day that Defendant fails to develop and fully implement an adequate SWPPP for the Facility.

111.   By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

112.   An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff for which harm she has no plain, speedy, or adequate remedy at law.

113.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## **FOURTH CAUSE OF ACTION**

**Failure to Develop and Implement an Adequate Monitoring and Reporting Program, In Violation of the Industrial Stormwater Permit (Violations of 33 U.S.C. §§ 1311)**

114.   Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

115.   Defendant has discharged and continues to discharge pollutants from the Facility in violation of the Industrial Stormwater Permit.  Defendant is also in violation of the Industrial Stormwater Permit for repeated failure to report proper annual stormwater discharge data as required by the Industrial Stormwater Permit. Thus, Defendant's discharges constitute an unpermitted discharge of pollutants from the Facility to waters of the United States in violation of CWA section 301(a), 33 U.S.C. § 1311(a).

116.   Defendant has been in violation of CWA section 301(a) every day they have discharged stormwater from the Facility to waters of the United States since December 6, 2014.  Defendant will continue to be in violation of the CWA each day that unpermitted stormwater discharges from the Facility to waters of the United States.

117.   By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365.

118.   An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff for which harm she has no plain, speedy, or adequate remedy at law.

119.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## RELIEF REQUESTED

Plaintiff respectfully requests this Court to grant the following relief:

A.   Declare Defendant to have violated and to be in violation of sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include the Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology requirements, and for failing to comply with the substantive and procedural requirements of the IGP;

B.   Enjoin Defendant from discharging pollutants from the Facility to stormwater discharge points, which discharge to the Los Angeles River and the overall Los Angeles River Watershed;

C.   Order Defendant to restore all receiving waters damaged by Defendant's illegal discharges of pollutants from the Facility;

D.   Enjoin Defendant from violating sections 301(a) and (b) and section 402(p) of the Clean Water Act and from violating the substantive and procedural requirements of the Industrial Stormwater Permit at the Facility;

E.   Order Defendant to pay civil penalties of up to $51,570 per day per violation for violations occurring after November 2, 2015 and $37,500 per day per violation for violations occurring after January 12, 2009 but before November 2, 2015.  33 U.S.C. § 1319(d), 40 C.F.R. §§ 19.1-19.4;

F.   Award Plaintiff her costs (including reasonable attorney, witness, and consultant fees) as authorized by the CWA section 505(d), 33 U.S.C. § 1365(d);

G.   Award such other relief as this Court may deem appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

August 6, 2020

By:      BRODSKY & SMITH, LLC

Evan J. Smith, Esquire (SBN242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN302113)
rcardona@brodskysmith.com
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Telephone:   (877) 534-2590
Facsimile:    (310) 247-0160

*Attorneys for Plaintiff*

PLAINTIFF'S COMPLAINT